STATE of Minnesota, by Theodore
WOYKE, etc., et al., Appellants,

v.

TONKA CORPORATION, Respondent.

No. C6–87–1550.

Court of Appeals of Minnesota.

March 8, 1988.

Review Denied May 4, 1988.

Timothy R. Thornton, Sue Halverson, Peter Hapke, Hart, Bruner, O'Brien & Thornton, Minneapolis, Wyman A. Nelson, Nelson, Nelson & Paulson, Cokato, for appellants.

Duane A. Arndt, Arndt & Benton, Peter S. Hendrixson, Becky A. Comstock, Dorsey & Whitney, Minneapolis, for respondent.

Heard, considered and decided by WOZNIAK, C.J., and PARKER and LANSING, JJ.

## OPINION

PARKER, Judge.

In September 1982 the Minnesota Pollution Control Agency (MPCA) received an anonymous tip that hazardous waste from Tonka Corporation had been improperly disposed of at the Theodore Woyke farm. Upon investigation, MPCA officials discovered approximately 300 paint and oil barrels at the Woyke farm, some containing benzene and trichlorethelene (TCE), materials the MPCA defines as hazardous. Soil analysis indicated that leakage and use of the oil for various purposes on the farm had contaminated the land.

The Woykes began legal action against Tonka, alleging negligence and seeking compensation for property damage, personal injury and negligent infliction of emotional distress. They also sued as nominal representatives of the State of Minnesota under the Environmental Rights and Liability Act, Minn.Stat. Ch. 115B (1984). The trial court allowed the state to intervene through the MPCA in order to seek injunctive relief against Woyke and Tonka requiring a cleanup of the farm. In October 1986 the MPCA and Tonka entered into a consent decree in which Tonka agreed to clean up the Woyke farm. Tonka counterclaimed against the Woykes for these "response" costs.

At the end of the Woykes' case in chief, Tonka moved for dismissal of all of their claims. The trial court dismissed the claims for personal injury and negligent infliction of emotional distress, finding that the Woykes had failed to produce evidence of injury. The court rejected the Woykes' motion to amend to include a claim of increased risk of cancer, because Minnesota does not recognize this claim. The trial

proceeded on the claim of negligent damage to property. At the end of the presentation of all the evidence, the trial court allowed the Woykes to amend their complaint, over strenuous objections by Tonka and with reluctance by the court, to include an intentional infliction of emotional distress claim with a claim for punitive damages. The court rejected a nuisance claim.

The case was submitted to the jury on a special verdict on the Woykes' surviving claims of negligent property damage, intentional infliction of emotional distress, punitive damages and Tonka's counterclaim for response costs. The jury returned a verdict for the Woykes on all claims, finding property damage in the amount of $110,000 and, on the claim for emotional distress, $550,000 actual and $1,960,000 punitive damages. The trial court granted Tonka's motion for judgment notwithstanding the verdict (JNOV) on the compensatory and punitive damages for emotional distress claims and ordered judgment in the amount of $110,000 for the Woykes' property damage, for the Woykes on Tonka's counterclaim, and for Tonka on all other claims.

The Woykes appeal. Tonka seeks review only in the event that this court disturbs the JNOV or final judgment in any way; otherwise, Tonka accepts the judgment on property damage and response costs. We affirm.

## FACTS

At the time of the events in issue, Tonka operated a toy manufacturing facility in Mound, Minnesota. Ted Woyke had been employed by Tonka for about 17 years, the last 16 in the paint department. His duties included operating a degreaser, removing grease and oil which coated parts of the toys during the manufacturing process prior to painting. The process used the solvent TCE, a suspected carcinogen. The oil from the degreaser was then heated to separate and distill the TCE for re-use. The remaining oil, which the distilling process was supposed to leave free of TCE, is referred to as "stillbottom."

Tonka had a policy of allowing employees to take home unneeded materials. When an employee took something from the plant, a "materials pass" was completed, describing what was taken and signed by the employee and a supervisor. Tonka retained two copies of the materials pass and gave one to the employee.

Woyke took materials home beginning in 1972. Among the materials were several barrels of still-bottom and obsolete paint. Woyke used the paint around the farm and gave some to neighbors. He used the oil to treat fence posts, control dust in the driveway and to control lice and rodents under a chicken coop. Empty barrels were used to make a fence. Several barrels, some leaking oil, were piled in the yard where the Woyke children played and often came into contact with the oil.

In September 1982 the MPCA, acting on an anonymous tip, investigated the Woyke farm and found several barrels containing flammable oil. Tests revealed that some of the barrels contained significant amounts of TCE and benzene. When Woyke was questioned by the MPCA, he stated that he brought the barrels home not knowing they contained TCE. He also indicated he had not brought home oil since 1979. A label on one barrel stated that it contained TCE contamination, but Woyke said the label, in use only since 1982, did not necessarily mean the barrel had oil in it when he brought it home. Tonka does not use benzene, and the source of benzene contamination of the farm has not been determined.

Tonka removed the barrels from the Woyke farm at the MPCA's insistence. For the next several months, the MPCA conducted analyses of the soil and water at the farm, concluding that the water was uncontaminated. The soil, however, particularly where the barrels had leaked and around the chicken coop, contained unacceptable levels of TCE. As intervenors in this case, the MPCA sought relief in the form of a cleanup of the farm. The MPCA approved Tonka's cleanup plan and entered into a consent decree in October 1986. Tonka incurred $260,000 in costs in carrying out the cleanup plan.

Evidence at trial indicated that although the cleanup process had been completed,

the farm was diminished in value. This diminution resulted from the MPCA's inability to guarantee that all contamination had been removed and the possibility that several years would pass before the land could ultimately be declared completely clean. Any deed for the farm must carry a notice of possible contamination, making sale difficult. Witnesses placed the reduction in value between $92,000 and $155,000, the latter figure being the estimated value of the farm if uncontaminated.

The Woykes testified that they have suffered extreme distress from this incident. According to their testimony, Mr. and Mrs. Woyke no longer sleep together and Mrs. Woyke suffers anxiety and is losing hair. The Woyke children, according to the family's testimony, suffer from more colds than before, are teased at school about the incident, and worry about themselves or their parents developing cancer and dying. No medical witnesses testified to physical injury or emotional distress suffered by the Woykes.

At trial Woyke testified that he took oil from the degreaser until shortly before the MPCA's investigation. His statement to the MPCA at the time of the investigation, however, indicates that he had not taken still-bottoms for several years. The last materials pass introduced into evidence was dated 1979.

## ISSUES

1. Were the Woykes entitled to compensatory damages for emotional distress based on negligence or nuisance claims?

2. Did the evidence at trial support the claim of intentional infliction of emotional distress, and did the court err in granting JNOV on this claim?

3. Did the trial court err in tying punitive damages to the claim for intentional infliction of emotional distress and not to negligence or nuisance?

## DISCUSSION

### I

■ In a negligence action, damages for emotional distress cannot be sustained unless the plaintiff first establishes (1) that the plaintiff was within the scope of the danger of the negligent act, and (2) plaintiff exhibits physical manifestations of emotional distress. *Leaon v. Washington County,* 397 N.W.2d 867, 875 (Minn.1986). No evidence was presented at trial that the Woykes suffered physical manifestations of emotional distress, other than their own testimony. The Woykes testified that Mrs. Woyke's hair is falling out and the children suffer more colds than previously.

■ In the absence of medical evidence establishing such manifestations, the trial court was properly skeptical of this subjective testimony. Trial courts must carefully scrutinize subjective evidence of injuries, and

verdicts for plaintiffs for any substantial amounts, when based chiefly on proof of subjective symptoms, will not usually be allowed to stand.

*Hubbard v. United Press International,* 330 N.W.2d 428, 440 n. 9 (Minn.1983) (quoting *Johnson v. Sampson,* 167 Minn. 203, 207, 208 N.W. 814, 816 (1926)). Here, medical evidence of injuries is "conspicuously absent from the record." *Id.* Absent an objective showing of physical manifestations of emotional distress, a damage award for negligent infliction of emotional distress is not usually appropriate.

■ The Woykes assert that damages for emotional distress could properly be based on an "implied finding of nuisance." The claim for nuisance damages runs throughout the Woykes' appeal, and they asserted the same claim at trial. Nuisance is most often considered a type of damages, not a cause of action.

Merely attaching the label "nuisance" to an action * * * does not alter the nature of the action. Where the acts or omissions constituting negligence are the identical acts which it is asserted gave rise to a cause of action for nuisance, the rules applicable to the negligence will be applied.

*Randall v. Village of Excelsior,* 258 Minn. 81, 86, 103 N.W.2d 131, 135 (1960). Thus, even if the Woykes were entitled to a sepa-

rate finding on a nuisance claim, the requirement of a physical manifestation would still preclude recovery for emotional distress, as in negligence.

## II

■ The Minnesota Supreme Court first recognized intentional infliction of emotional distress as an independent tort in *Hubbard v. United Press International*, 330 N.W.2d 428 (Minn.1983). Before *Hubbard*, damages for mental anguish or suffering could not be sustained without physical injury in the absence of a direct invasion of a plaintiff's rights, such as libel, slander, malicious prosecution, seduction, or other willful, wanton or malicious conduct. *Id.* at 438. Recovery of damages for mental or emotional distress was barred because the court feared fictional allegations and abuse of the judicial process. *Id.* Determining that other methods were available to protect the judicial process, the supreme court decided to recognize the independent tort. *See id.*

The *Hubbard* court established stringent elements that must be met before damages for intentional infliction of emotional distress may be awarded: (1) the defendant's conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; and (4) the emotional distress must be severe. *Id.* at 438–39. The evidence at trial failed to establish the existence of these four necessary elements.

Extreme and outrageous conduct is conduct that is " 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.' " *Id.* at 439 (quoting *Haagenson v. National Farmers Union Property & Casualty Co.*, 277 N.W.2d 648, 652 n. 3 (Minn.1979)). This standard would require knowledge, either actual or constructive, by Tonka that the still-bottoms released to Woyke contained TCE. No evidence supports the allegation of such knowledge.

The materials passes introduced at trial indicate that Woyke took no still-bottoms after the MPCA required that still-bottoms be disposed of as hazardous waste regardless of TCE content. A laboratory analysis done for Tonka after the date of the last materials pass showing Woyke took still-bottoms indicated that the still-bottoms contained no TCE. In the absence of a showing of knowledge by Tonka that the still-bottoms contained TCE, Tonka's behavior cannot be described as so atrocious that it offends notions of decency.

The facts here are similar to *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81 (3d Cir.1987). In *Wisniewski*, survivors of a deceased asbestos worker brought suit against the deceased's employer, claiming intentional infliction of emotional distress. Death was allegedly caused by constant exposure to asbestos dust, even away from the workplace, through contamination of the deceased's clothing. *Id.* at 83. The court held that the plaintiffs had failed to show defendant's knowledge of the hazard and therefore the defendant's conduct could not be considered outrageous. *Id.* at 86.

■ Here, as in *Wisniewski*, the Woykes offered a substantial amount of evidence to show potentially outrageous conduct not directed at them. Witnesses at trial alleged that Tonka had repeatedly violated federal and state environmental protection laws by dumping waste at various sites, by illegally burning materials, and by failing to keep accurate records. Allegations were also made that Tonka moved its operation out of the state to avoid further compliance with Minnesota's strict environmental protection laws. We agree with the *Wisniewski* court, however, that evidence "that [respondents] acted outrageously vis-a-vis third parties * * * is not sufficient to support a claim of intentional infliction of emotional harm to appellants." *Id.*

The Woykes also failed to establish the second element, intent or recklessness, required for a finding of intentional infliction of emotional distress. *See Hubbard*, 330 N.W.2d at 439. The evidence does not show that emotional distress was a natural and probable consequence of Tonka's conduct or that Tonka acted with deliberate disregard of a high degree of probability that emotional distress would follow. *See*

*Wisniewski,* 812 F.2d at 87. As a threshold requirement to show intent or recklessness, Woyke would have had to show that Tonka knew or should have known that the still-bottoms contained TCE.

The evidence also fails to prove a causal connection to, or even the existence of, emotional distress. As previously discussed, subjective evidence, in the absence of medical testimony, will not usually be sufficient. *See Hubbard,* 330 N.W.2d at 440. The symptoms described by the Woykes, even if true, are also not of the type "that no reasonable person could be expected to endure." *See id.* The Woykes have therefore not proved any of the four elements required by *Hubbard* to sustain a claim of intentional infliction of emotional distress.

### III

 The Woykes claim they are entitled to punitive damages even if the claim of intentional infliction of emotional distress is denied. Punitive damages are awarded only when clear and convincing evidence of willful indifference to the rights or safety of others exists. Minn.Stat. § 549.20, subd. 1 (1986). The Woykes and Tonka agree that the standards for punitive damages are similar to those required to find intentional infliction of emotional distress. We also agree. *See Wisniewski,* 812 F.2d at 86 n. 3.

The record, however, does not establish willful indifference to the safety of others, even by a preponderance standard, and must necessarily fall short of a clear and convincing standard. The Woykes are not entitled to punitive damages on the finding of negligence.

### IV

The court's judgment awarded the Woykes $110,000 for property damage and left Tonka with the entire $260,000 expenditure for the cleanup costs. Tonka sought review only in the event that this court disturbed the JNOV; therefore, we do not reach the question of whether the judgment against Tonka on the issues of property damage and response cost was proper.

DECISION

Affirmed.