*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0983**

Randall Norman, et al.,
Respondents,

vs.

Crow Wing Cooperative Power & Light Company,
Appellant.

**Filed February 22, 2016
Affirmed
Reilly, Judge**

Cass County District Court
File No. 11-CV-12-1670

David F. Herr, Jesse D. Mondry, Maslon LLP, Minneapolis, Minnesota; and

Charles A. Bird, Jeremy R. Stevens, Grant M. Borgen, Bird, Jacobsen & Stevens, PA, Rochester, Minnesota; and

William D. Mahler, Will Mahler Law Firm, Rochester, Minnesota (for respondents)

Eric J. Magnuson, Lisa L. Beane, Robins Kaplan LLP, Minneapolis, Minnesota; and

Paul F. Carlson, Matthew S. Van Bruggen, Kennedy, Carlson & Van Bruggen, LLP, Wadena, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Worke, Judge; and Chutich, Judge.

UNPUBLISHED OPINION

**REILLY**, Judge

Respondents Randall and Peggy Norman (the Normans) operated a dairy farm in Pine River, Minnesota, from 1983 to 2012. Appellant Crow Wing Cooperative Power and Light (the cooperative) is a member-owned electrical cooperative that provides electricity to the Normans' farm. The Normans sued the cooperative alleging that its negligent delivery of electricity caused stray electrical voltage that injured the Normans' herd of dairy cows, causing the Normans to suffer economic harm. The Normans also alleged that the cooperative created a nuisance causing the Normans to suffer loss of use and enjoyment of their property. A Cass County jury awarded the Normans $4,861,478 in negligence damages and $1.5 million in nuisance damages. On appeal, the cooperative challenges: (1) the sufficiency of the evidence to establish that damages began to accrue in 1994, (2) the method of computing negligence damages, (3) the sufficiency of the evidence to support the nuisance award, (4) a jury instruction, (5) the district court's refusal to submit a question on the verdict form asking about the farmers' contributory negligence in the design and maintenance of their farm, and (6) the district court's grant of permanent injunctive relief. For the reasons stated below, we affirm.

## FACTS

The Normans are dairy farmers who started operating their farm in 1983. Beginning in 1994, the Normans' herd began experiencing health issues that caused a decline in milk production. In 1994 the herd's milk production was 27% above the state average. Over the next 18 years, the herd experienced numerous problems including fresh-cow issues,

2

displaced abomasum, ketosis, mastitis, body-condition issues, difficulty getting pregnant, refusal to eat or drink water, and excessive weight loss. The cause of these problems was unknown to the Normans at the time. In 1991 and again in 2011 stray voltage was detected on the farm. It is widely recognized that stray voltage can use cow hooves as an unintended pathway causing health issues in cows. *Poppler v. Wright Hennepin Co-op. Elec. Ass'n*, 834 N.W.2d 527, 534 (Minn. App. 2013) (*Poppler I*), *aff'd on other grounds* 845 N.W.2d 168 (Minn. 2014) (*Poppler II*). The Normans ultimately liquidated their herd in September 2012. When the herd was sold, the milk production had declined to 20% below the state average.

The Normans sued the electrical cooperative alleging negligence and nuisance. In October 2014, after a three-week trial, the jury found the cooperative negligent in the delivery of electrical service to the Normans' dairy farm, and the Normans not negligent with respect to their use or maintenance of their on-farm electrical facilities. The jury also found that the cooperative created a nuisance that interfered with the Normans' use and/or enjoyment of their farm. The jury awarded the Normans $4,861,478 on their negligence claim and $1.5 million in nuisance damages. The cooperative filed a motion for a new trial or remittitur, which was denied. The district court granted the Normans injunctive relief in the form of changes to the electrical delivery system to their farm.

## D E C I S I O N

### I.

The cooperative first argues that the district court erred by allowing recovery dating back to 1994, when "no one could testify at trial to the presence of stray voltage on the

3

farm before 2011." It asserts that the damages award was "based on impermissible conjecture and speculation" because "(1) stray voltage was first measured on the Norman farm in 2011, and (2) no evidence was offered that showed the difference between production before and after there was a claimed stray voltage problem." While it is true that damages that are speculative, remote, or conjectural are not recoverable, *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn. 1980) (citations omitted), the cooperative's "speculation" argument regarding the damages is based on a challenge to the underlying evidence, and is ultimately a challenge to the sufficiency of the evidence. We treat it as such.

In challenges to sufficiency of the evidence, the evidence must be reviewed in the light most favorable to the verdict. *Reedon of Faribault, Inc. v. Fid. & Guar. Ins. Underwriters, Inc.*, 418 N.W.2d 488, 491 (Minn. 1988). "[A]n appellate court should not set aside a jury verdict unless it is manifestly and palpably contrary to the evidence viewed as a whole." *Raze v. Mueller*, 587 N.W.2d 645, 648 (Minn. 1999) (internal quotation omitted). In a recent stray-voltage case we noted that "[t]he jury is entitled to make reasonable inferences, and we review the jury's inferences in the light most favorable to the verdict." *Poppler I*, 834 N.W.2d at 544.

The cooperative does not dispute that the Normans' herd suffered health issues, but argues that, because stray voltage was not detected on the farm until 2011, there is not sufficient evidence in the record to support the damages award dating back to 1994. The cooperative's assertion that stray voltage was first measured on the Norman farm in 2011 is factually inaccurate. The record contains a "stray voltage checklist" from 1991 which

4

indicated stray voltage was present on the farm at that time. The cooperative asserts that the stray-voltage checklist "strongly suggests that the source of the voltage detected in 1991 was on the farm side rather than the utility side," but the jury found on the special verdict that the Normans were not "negligent with respect to their use or maintenance of their on-farm electrical facilities."

In essence, the cooperative is asking this court to credit evidence that the jury rejected. We only overturn a jury verdict "if no reasonable mind could find as the jury did." *Reedon*, 418 N.W.2d at 491. Sufficient evidence in the record supports a finding that stray voltage was present on the farm dating back to 1994 because evidence showed the presence of voltage on the farm in 1991. Although the Normans' herd did not experience issues until 1994, the jury also heard that in 1993 the Normans replaced wooden tie stalls with metal tie stalls, and that the cows thereafter were chained to neck rails of galvanized steel. Thus a reasonable mind could conclude that stray voltage was present on the farm, but did not begin affecting the herd until the changes were made to the tie stalls and barn.

The cooperative notes that no person "who worked on [the Normans'] farm from 1994 to 2012 contemporaneously identified stray voltage as a possible cause of the problems." However, the cooperative acknowledges that "every witness presented by the Normans at trial identified stray voltage as a possible cause of the problems." We are not persuaded that it was necessary for the Normans to provide evidence that someone "contemporaneously identified" stray voltage as a cause of the problems on the farm to sustain the jury's verdict.

5

In *Poppler I*, Wright Hennepin Cooperative argued that "the Popplers' evidence [was] insufficient to prove that the dairy herd was exposed to stray voltage throughout the entire damages period." 834 N.W.2d at 543. We determined that the district court did not abuse its discretion by allowing various experts to testify that stray voltage was the cause of the herd's health problems when the experts "collectively . . . rule[d] out potential alternative causes of the herd's health problems in their respective areas of expertise." *Id.* at 539. We noted that "at least one court has held that expert evidence is not even necessary to prove causation in stray-voltage cases because 'the nature of electricity and the results of contact with it by humans and animals is not beyond a common person's understanding.'" *Id.* (quoting *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999)). Further, scientific testing throughout the period for which the Popplers sought damages was not necessary to establish that they sustained damages during that time frame. *Id.* We held that the evidence was sufficient to prove that the dairy herd was exposed to stray voltage when there was evidence presented that the herd began experiencing health problems in 2006 and that from 2006 to the 2011 trial the herd was not producing milk at the usual rate. *Id.*

In this case, numerous experts testified that stray voltage caused the Normans' herd's health problems. For example, Dr. Steven Koskiniemi, the Normans' veterinarian from 1993 to 2001 and 2011 to 2012, testified that he witnessed behaviors in the herd that were consistent with exposure to stray voltage. Dr. John Niemi, the Normans' primary veterinarian as of 1999, testified that it was his opinion to a reasonable degree of scientific certainty that stray voltage was the cause of the herd's problems. Dr. Kenneth Learmont,

6

a dairy technical service veterinarian, testified that, based on the issues with the herd, he believed that stray voltage began affecting the herd in 1994 and was the cause of the health and milk production problems.

The cooperative's sufficiency argument also rests on the assertion that "no evidence was offered that showed the difference between production before and after there was a claimed stray voltage problem." But there is evidence that the Normans' herd began having issues in 1994 and at that time the milk production of the herd was 27% above the state average; that the herd experienced erratic milk production for the next 18 years; and that, when the Normans sold their herd in September 2012, the milk production had declined to 20% below the state average. This evidence of declining production over 18 years is sufficient to support the jury's verdict.

The jury heard from numerous experts who testified, at minimum, that the problems with the herd were consistent with problems caused by stray voltage. The jury also heard that stray voltage was present on the farm as early as 1991. The onset of the herd's issues, which were consistent with stray voltage, was in 1994. Juries are entitled to make reasonable inferences, and the inferences made by the jury in this case were reasonable. *Poppler I*, 834 N.W.2d at 544. When viewed in the light most favorable to the jury's verdict, the evidence in the record is sufficient to support the jury's verdict. And, because there was sufficient evidence to support the jury's verdict, we reject the cooperative's argument that the damages award was speculative.

7

## II.

The cooperative next argues that the district court erred by denying its motion for a new trial or remittitur because the negligence damages awarded included some of the lost profits twice. "[A] plaintiff may not recover duplicative money damages." *Abraham v. Cnty. of Hennepin*, 639 N.W.2d 342, 347 (Minn. 2002). "A double recovery occurs any time the damages recovered exceed the total loss sustained by the parties." *Lefto v. Hoggsbreath Enters., Inc.*, 567 N.W.2d 746, 749 (Minn. App. 1997) (citing *Black's Law Dictionary* 491 (6th ed. 1990)), *aff'd*, 581 N.W.2d 855 (Minn. 1998). However, damages are a question of fact for the jury to decide based on the evidence, and wide deference is accorded to a jury's finding as to how much money will adequately compensate the plaintiff. *Koehler v. Kline*, 290 Minn. 485, 487, 185 N.W.2d 539, 541 (1971). We will set aside a damages award only if it is "manifestly and palpably contrary to the evidence," when viewed in a light most favorable to the verdict. *Levienn v. Metro. Transit Comm'n*, 297 N.W.2d 272, 273 (Minn. 1980).

Lost profits are an appropriate measure of damages, *Poppler I*, 834 N.W.2d at 548, and excess operating costs are an element of lost profits. *N. Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 125, 211 N.W.2d 159, 166 (1973). In this case, the jury awarded damages in the precise amount calculated by the Normans' damages expert, Dr. Michael Behr. Behr is a forensic economist who specializes in agricultural economics and has been involved in 400 stray voltage cases.[1] Behr prepared an expert damages report,

---

[1] The cooperative notes in its reply brief that the Normans rely heavily on this court's most recent stray-voltage case, *Poppler I*, where we rejected Behr's method for calculating

8

basing his damages calculation on both "reduced milk production" and "reduced feed intake." Reduced milk production, or milk loss, refers to the decrease in revenues from lost sales of milk. *Poppler I*, 834 N.W.2d at 546. Reduced feed efficiency occurs when the "costs of feed are higher than they should be for the amount of milk that was actually realized." Behr determined that the Normans' loss was $4,861,478 based on "reduced milk production, reduced feed efficiency, and capital loss," subtracting for any cost savings in milk production.

Behr testified extensively at trial regarding his calculation of damages. Appellant's trial counsel vigorously cross-examined Behr. Asked whether the milk-production and reduced-feed-efficiency damages were duplicative, Behr responded, "Absolutely not." He explained that there is nothing "in this feed efficiency analysis that duplicates anything that is in the earlier milk loss section of the report." He further explained that, "when the cows give less milk than they should have been giving, that's an element of loss. Then the additional question, which is not an overlap of the first one, is the extent to which the milk that was produced was done under higher cost conditions [than] it should have been." The

---

damages. In *Poppler I*, we reversed when we determined the "Popplers' evidence [was] insufficient to support the jury's damages award" because their theory of "milk loss" was incompatible with Minnesota caselaw on lost profits. *Poppler I*, 834 N.W.2d 548. This court explained that the Popplers "provided only one component of the lost-profits equation by introducing evidence that the decrease in milk production caused a decrease in revenues[, but] did not provide the other component by introducing any evidence as to whether their expenses also decreased." *Id.* at 547. We held that the Popplers "needed to introduce evidence of the existence and amount of their decrease in revenues as well as the existence or non-existence and amount of any offsetting decrease in their expenses." *Id.* at 547-48. The method Behr used to calculate damages in the present case is different from the method he used to calculate damages in *Poppler I* because he accounted for cost savings as part of the equation of lost profits.

cooperative's expert, Dr. James Kliebenstein, questioned Behr's inclusion of reduced feed efficiency in the damages calculation, testifying that

> it's a complex issue . . . but from what I've seen, it seems to indicate that maybe the feed stayed the same. It's just the milk production loss decreased so let's bring the milk value back up to where the feed was. So I'm not sure there's a feed adjustment that's even needed in this particular case.

We conclude that the evidence is sufficient to support a damages award encompassing both milk loss and reduced feed efficiency. Behr provided specific testimony on the differences between the two calculations, essentially explaining that reduced milk production is a measure of outputs and reduced feed efficiency is a measure of inputs. The jury was free to credit Behr's unequivocal testimony that there was no overlap in the damages calculations over Kliebenstein's less certain testimony questioning the calculation method. *See Kundiger v. Prudential Ins. Co. of Am.*, 219 Minn. 25, 28, 17 N.W.2d 49, 52 (1944) (explaining that, "if there was expert testimony in support of plaintiff's theory as well as defendant's, the choice of which testimony to accept and which to reject was for the jury"). Because we cannot conclude that the jury's verdict is "manifestly and palpably contrary to the evidence," *Levienn*, 297 N.W.2d at 273, we reject the cooperative's argument for a new trial or remittitur on this basis.

**III.**

The cooperative challenges the $1.5 million nuisance award, arguing that it includes impermissible emotional-distress damages. As an initial matter, we note that the jury was properly instructed on nuisance law, and "[w]e presume that juries follow the instructions they are given." *Frazier v. Burlington N. Santa Fe Corp.*, 811 N.W.2d 618, 630 (Minn.

10

2012), *modified* (Minn. Apr. 19, 2012). We, therefore, treat the cooperative's challenge as a challenge to the sufficiency of the evidence to sustain the nuisance award.

A nuisance is "[a]nything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Minn. Stat. § 561.01 (2014). A nuisance action "may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered." *Id.* The Minnesota Supreme Court has "recognized nuisance claims when a plaintiff can show that the defendant's conduct caused an interference with the use or enjoyment of the plaintiff's property." *Johnson v. Paynesville Farmers Union Co-op. Oil Co.*, 817 N.W.2d 693, 706 (Minn. 2012). In *Johnson*, soybean farmers whose crops had been damaged by pesticides from a neighboring farm sought to bring a nuisance claim because the pesticide drift "caused additional record-keeping and other burdens in connection with the operation of their farm[,]" and one of the farmers suffered from "cotton mouth, swollen throat and headaches" due to the pesticide drift. *Id.* at 713. The court concluded:

> In *Highview North Apartments v. County of Ramsey*, we held that "disruption and inconvenience" caused by a nuisance are actionable damages. 323 N.W.2d 65, 73 (Minn. 1982). The "inconvenience" and adverse health effects the Johnsons allege are the type of claims contemplated in *Highview North Apartments,* and if proven, they may affect the Johnsons' ability to use and enjoy their land and thereby constitute a nuisance. *See* Minn. Stat. § 561.01.

*Id.*

The Normans contend the record is replete with evidence supporting their discomfort, annoyance, and loss of enjoyment in their property. We agree. The jury heard how the Normans had increased labor due to extra feces in the milking parlor and caring for sick cows, including forcing medication down the throats of the cows. The jury additionally heard how the Normans were afraid to use their river for swimming and fishing, and were afraid to let their grandchildren play outside due to the stray voltage. We see no legally significant difference between the nuisance the soybean farmers in *Johnson* alleged, and the nuisance experienced by the Normans, and thus we conclude that sufficient evidence sustains the nuisance award.

The cooperative attempts to cast the nuisance damages as emotional-distress damages because the finding of nuisance in this case was predicated on a determination that the cooperative was negligent. *See Highview North Apartments*, 323 N.W.2d at 70-71 ("[T]here must be some kind of conduct causing the nuisance harm which is wrongful."). Nuisance actions are always predicated on wrongful conduct. *Id.* ("This wrongful conduct varies, and may at times be characterized as intentional conduct, negligence, ultrahazardous activity, violation of a statute or some other tortious activity."). The legislature created a statute to allow for recovery under nuisance and we defer to its legislative authority. To not allow recovery in nuisance because it was predicated in negligence is contrary to the plain language of the nuisance statute.

In support of its position, the cooperative relies on *State by Woyke v. Tonka Corp.*, 420 N.W.2d 624, 627 (Minn. App. 1988), and *Randall v. Village of Excelsior*, 258 Minn. 81, 86, 103 N.W.2d 131, 135 (1960). In *Woyke* we explained that

12

> [n]uisance is most often considered a type of damages, not a cause of action. Merely attaching the label 'nuisance' to an action does not alter the nature of the action. Where the acts or omissions constituting negligence are the identical acts which it is asserted gave rise to a cause of action for nuisance, the rules applicable to the negligence will be applied.

420 N.W.2d at 627 (quoting *Randall*, 258 Minn. at 86, 103 N.W.2d at 135). However, both *Woyke* and *Randall* are distinguishable. In *Woyke* the plaintiff made no claim that a nuisance occurred, expressly sought emotional-distress damages, and argued the damages could be sustained on an "*implied* finding of nuisance." *Woyke*, 420 N.W.2d at 627-28 (emphasis added). Here, the Normans did not seek to recover for emotional distress based on negligence, and instead brought a statutory nuisance cause of action. In *Randall*, the plaintiff attempted to bring a nuisance claim in place of the negligence claim, which was statutorily barred. 258 Minn. at 87, 103 N.W.2d at 135 ("As much as we might wish to reach for the result plaintiff seeks, judicial restraint prevents us from doing so. We are dealing here with an important area of tort responsibility in which the legislature has already by the Civil Damage Act extended common-law liability."). In the present case the Normans did not attempt to bring a nuisance claim where they could not bring a negligence claim; to the contrary, they had to prove appellant's negligence before recovering in nuisance under Minn. Stat. § 561.01.

We are not persuaded by the cooperative's attempt to characterize the nuisance award as emotional-distress damages, and hold there was sufficient evidence of the Normans' loss of use and enjoyment in their property to sustain the nuisance award.[2]

## IV.

The cooperative next argues it is entitled to a new trial because the district court erred in its jury instruction on the Normans' burden to prove damages. "The district court has broad discretion in determining jury instructions and [an appellate court] will not reverse in the absence of abuse of discretion." *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 (Minn. 2002). "[A] court errs if it gives a jury instruction that materially misstates the law." *Rowe v. Munye*, 702 N.W.2d 729, 735 (Minn. 2005).

A plaintiff "must demonstrate with reasonable certainty the nature and probable duration of the injuries sustained," *Canada v. McCarthy*, 567 N.W.2d 496, 507 (Minn. 1997), but, "[o]nce the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount," *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977).

---

[2] We note other jurisdictions allow for farmers to recover nuisance damages based on annoyance and inconvenience caused by stray voltage. *Gumz v. N. States Power Co.*, 721 N.W.2d 515, 522 (Wis. App. 2006) ("the jury . . . hear[d] evidence regarding the time and effort he put into attending to his dairy herd over the years due to the stray voltage, which is part of the compensable annoyance and inconvenience."), *aff'd*, 742 N.W.2d 271(Wis. 2007); *see also Vogel v. Grant-Lafayette Elec. Co-op.*, 548 N.W.2d 829, 834 (Wis. 1996) ("We conclude that nuisance law is applicable to stray voltage claims because excessive levels of stray voltage may invade a person's private use and enjoyment of land. Although excessive levels of stray voltage may be found to constitute a nuisance in certain circumstances, we do not hold that it constitutes a nuisance under all circumstances. The determination of whether stray voltage unreasonably interferes with a person's interest in the private use and enjoyment of land is reserved for the trier of fact.").

The district court gave the following jury instruction on the burden of proof:

> A party seeking damages must prove the nature, extent, duration and consequences of his harm. Determination of damages must not be based upon speculation or guess, but proof of damages to an absolute certainty is not required. The Normans need only prove a reasonable basis upon which to approximate the amount.[3]

The cooperative contends that the instruction materially misstated the law on burden of proof because the last sentence of the instruction contains the term "reasonable basis" instead of "reasonable certainty." But the cooperative did not object to the instruction at trial on the grounds that it misstated the law; instead, it observed that the last sentence of the instruction was "unnecessary." Thus, it is questionable whether the challenge to the jury instruction is properly before the court. *See Ferguson v. Larson*, 260 N.W.2d 467, 470 (Minn. 1977) ("An appellant may not on appeal allege as error a trial court's failure to give an instruction that was never requested."). Assuming that it is properly before this court, we conclude that appellant is not entitled to a new trial because the jury instruction did not materially misstate the law. *See Rowe*, 702 N.W.2d at 735.

The use of the term "reasonable basis" did not refer to the nature or duration of the damages, but instead to the approximate amount of damages. Therefore, the jury instruction did not materially misstate the law because it properly reflects the standard for

---

[3] In contrast, the Minnesota Civil Jury Instructions Guides states that "A party asking for damages must prove the nature, extent, duration, and consequences of his or her *(injury)(harm)*. You must not decide damages based on speculation or guess." 4A Minn. Dist. Judges Ass'n, Minnesota Practice, Jury Instruction Guides – Civil, CIVJIG 90.15 (6th ed.).

burden of proof that the approximate amount of recovery only need to be proved by a reasonable basis. Although the jury instruction could have been clearer by adding "once nature and duration of damages have been proven to a reasonable certainty" before "[t]he Normans need only prove a reasonable basis upon which to approximate the amount," the instruction as written was not so misleading as to constitute reversible error. *See Hilligoss*, 649 N.W.2d at 147 ("An instruction that is so misleading that it renders incorrect the instruction as a whole will be reversible error, but a jury instruction may not be attacked successfully by lifting a single sentence or word from its context. Where instructions overall fairly and correctly state the applicable law, appellant is not entitled to a new trial.") (quotations omitted). The jury instruction was not a material misstatement of the law, and therefore, the cooperative is not entitled to a new trial on this basis.

## V.

The cooperative next argues it was prejudiced because the special verdict form prevented the jury from attributing negligence to Normans' management of their farm and herd. "District courts have broad discretion to decide whether to use special verdicts and what form special verdicts are to take." *Poppler II*, 845 N.W.2d at 171. Notwithstanding this discretion, special verdict forms in comparative-negligence cases are subject to certain statutory requirements. Under Minn. Stat. § 604.01, subd. 1 (2014),

> [t]he court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each party and the court shall then reduce the amount of damages in proportion to the amount of fault attributable to the person recovering.

16

*See also Frey v. Snelgrove*, 269 N.W.2d 918, 923 (Minn. 1978) ("If there is evidence of conduct which, if believed by the jury, would constitute negligence (or fault) on the part of the person inquired about, the fault or negligence of that party should be submitted to the jury.") (citations and internal quotations omitted). The statutory language clearly assigns separate tasks to the jury and the court. The jury is to make separate findings as to (1) the comparative negligence of each party (and any identified third parties); and (2) the damages suffered by the plaintiff. Importantly, the damages finding is made without regard to comparative fault. Minn. Stat. § 604.01, subd. 1; *see also* CIVJIG 90.10 (instructing jury, in deciding damages, not to "consider the possible effect of your answers to other questions"). The district court then is tasked with apportioning damages based on the jury's comparative-fault findings. Minn. Stat. § 604.01, subd. 1.

In this case, the district court departed from the statutory process in two ways. First, the district court limited the comparative-negligence questions on the special verdict form to negligence related to the handling of electricity. At trial, the cooperative had advanced the alternative theory that the Normans' damages were caused by their negligence in the design and maintenance of their farm. The cooperative presented evidence to support this theory,[4] and it was entitled to a special verdict form that would allow the jury to allocate

---

[4] Veterinarian, David Reid, who visited the farm in September 2012, shortly before the Normans liquidated their herd, testified about problems with the Normans' milking techniques and equipment, issues with cow nutrition, and the water quality on the farm. Reid opined that the facilities' design and maintenance contributed to and caused injuries. But Reid first visited the farm only days before the Normans liquidated their herd, and his testimony was contradicted by numerous veterinarians and other experts who testified the Normans were excellent farmers.

fault based on this theory. Although the special verdict form asked the jury to attribute fault to the Normans based on any negligence "with respect to their use or maintenance of their on-farm electrical facilities," it did not ask the jury to attribute fault to the Normans based on their negligence in the design and maintenance of the farm. This was error.

The district court also erred by limiting the damages question on the special verdict to damages caused by the cooperative. This was contrary to the statutory requirement of separate findings on comparative-fault and damages and obviated the statutory requirement that the district court reduce the damages based on the jury's comparative-fault findings.

Special verdict forms in comparative-negligence cases must be carefully worded to minimize the risk of inconsistent verdicts. *See Meinke v. Lewandowski*, 306 Minn. 406, 410, 237 N.W.2d 387, 391 (1975) (noting "extremely difficult position" of district court after wording of special verdict led to inconsistent verdict). We cannot condone the district court's errors in departing from the statutory process. Nevertheless, we will not disturb the jury's verdict on this basis if the errors were harmless. *See* Minn. R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

To prevail on appeal, an appellant must show both error and prejudice resulting from the error. *Midway Ctr. Assocs. v. Midway Ctr. Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975). "[A]n error affects substantial rights where there is a reasonable likelihood that the absence of the error would have had a significant effect on the jury's verdict." *Poppler I*, 834 N.W.2d at 553 (quotation omitted). The cooperative bears the burden of persuasion

18

to establish that the district court's error affected its substantial rights. *Midway Ctr. Assocs.*, 306 Minn. at 356, 237 N.W.2d at 78.

The final question on the special verdict form asked, "What sum of money will fairly and adequately compensate the Normans for losses directly caused by Crow Wing Power, its agents or employees' negligent delivery of electrical service to the Norman dairy farm[?]" Thus, the special verdict form was narrowly tailored so that the Normans could only be awarded damages caused by the cooperative's negligence. Although the jury could not attribute fault to the Normans for their negligent design and maintenance of the farm, the jury also could not award damages to the Normans attributable to their own fault. Thus, although we do not condone the phrasing of the final question, we are not persuaded that a properly worded special verdict form would have produced a different damages award. Accordingly, we conclude that the erroneously worded special verdict form was harmless.

**VI.**

The cooperative argues that the district court abused its discretion in granting permanent injunctive relief. We review orders granting permanent injunctions under an abuse-of-discretion standard. *Williams v. Nat'l Football League*, 794 N.W.2d 391, 395 (Minn. App. 2011), *review denied* (Minn. Apr. 27, 2011).

In December 2014, the Normans sought injunctive relief in the form of changes to the electrical delivery system to their farm. The district court requested that the parties exchange electrical-engineering-design proposals. The parties were able to reach an agreement on the majority of the design, but an evidentiary hearing was held for four design issues the parties were unable to resolve. Both parties presented testimony from engineers.

19

By agreement of the parties, additional affidavits were submitted to the district court after the hearing. The district court granted the Normans' "requested injunctive relief of installation of [a] three-phase wiring to [the Normans'] farm" and ordered:

> 2. The transformer connection between the primary and secondary electrical systems shall be the Wye-Wye transformer connection proposed by [the Cooperative's expert] Mr. Sonju.
> 3. [Crow Wing Cooperative] shall remove the 48-foot ground rods from [the Normans'] farm. In the event the couplings break and the rods are unable to be completely removed, then the service station shall be relocated to a mutually agreed upon location.
> 4. The new ground rods installed on [the Normans'] farm shall be 8 feet in length and shall be placed 50 feet apart.
> 5. The ground wires shall be protected by a conduit and buried deeply to protect their integrity.
> 6. [Crow Wing Cooperative] shall not be required to remove the bare or jacketed neutral portions of the underground cable.

The cooperative argues that the district court abused its discretion in ordering this injunctive relief because "there is no evidence in the record to support the conclusion that the 48-foot ground rods need to be removed or that the new 8-foot ground rods need to be placed 50 feet apart." *See City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 24 (Minn. 2011) ("[A] district court abuses its discretion when its decision is against the facts in the record.").

Our review of the record reveals that there is support for the district court's determination. Donald Johnson, a licensed professional electrical engineer, testified as an expert witness for the Normans. Johnson testified that the 48-foot ground rods needed to be removed and that the new ground rods should be placed 50 feet apart. The cooperative's expert, Erik Sonju, provided contradictory testimony on both issues. As the cooperative

notes in its brief, "[t]he district court adopted [the Normans' expert's] assertions in its injunction order, despite the testimony from [the cooperative's expert]." In essence, the cooperative asks this court to make a credibility determination regarding the competing experts' testimony. We defer to the district court on matters of credibility. Minn. R. Civ. P. 52.01 ("[D]ue regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses."). The district court's findings were based on reasonable evidence provided by the Normans' expert and we will not disturb a district court's findings if there is reasonable evidence to support them. *Rogers v. Moor*e, 603 N.W.2d 650, 656 (Minn. 1999). The district court did not abuse its discretion in granting permanent injunctive relief.

**Affirmed.**